## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WILLIAM C. FLAX, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. Action No. 03-922-GMS |
| | ) |
| STATE OF DELAWARE Division of | ) |
| Family Services, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM**

## I. INTRODUCTION

The plaintiff, William C. Flax ("Flax"), filed this lawsuit on October 1, 2003, alleging

employment discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §

2000e-5. (D.I. 2.) An amended complaint was filed on January 1, 2005, raising additional

claims under 42 U.S.C. § 1981a; the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§

12112 and 12203(a); the Rehabilitation Act, 29 U.S.C. § 791; the National Labor Relations Act

("NLRA"), 29 U.S.C. § 158; and the Consumer Credit Protection Act, 15 U.S.C. § 1673 through

§ 1677. (D.I. 73.) Flax proceeds *pro se.* Before the court is the defendant's ("the State") motion

for summary judgment, supporting brief, Flax's response, and the State's reply. (D.I. 198, 199,

204, 205, 206, 207, 208.) For the reasons that follow, the court will grant the motion for

summary judgment.

## II. BACKGROUND

The court views the evidence in the light most favorable to Flax and draws all reasonable

inferences in his favor. Flax was employed by the defendant, State of Delaware, Division of

Family Services ("DFS"), an agency under the umbrella of the Department of Services for

Children, Youth and Their Families ("DSCYF").[1] Flax began working for the State in 1997 in

the DFS Kent County office and last worked for the DFS in September 2002. Flax sets forth

several facts of alleged discrimination prior to the time of his work related injury in February

2001. He asserts these facts are admissible under the continuing violation theory.[2]

In 1999, Flax transferred to New Castle County, Elwyn location which is the Northern

Regional Office of DFS. The office is overseen by Ms. Shirley Roberts ("Roberts"), the regional

administrator for the DFS. (D.I. 167, 2.) Roberts reports to Candace Charkow ("Charkow"),

---

[1]The DSCYF is an arm of the State of Delaware and the DFS is a part of the DSCYF. Del. Code Ann. tit. 28, §§ 9002, 9003, 9006(1).

[2]For example, before his hire in 1997, Flax initiated a race discrimination complaint due to his concern that he was not being treated fairly during the interview/employment process. (D.I. 89, 5.) After his hire, Flax submitted a grievance in March 1999, and complained that he was being treated "unfairly." (D.I. 206, ex.) In June 1999, Flax complained that his grievance was not resolved and he wanted to proceed to resolution. (D.I. 206, ex.) On September 6, 2000, Flax complained that while he had received good evaluations in the past, and expected to be recommended for the master family service specialist, he had yet to receive the required rating for promotion; however, in October the rating was received. (D.I. 167, ex. 8; D.I. 206, ex.) In November 2000, Flax filed a grievance complaining that he had not been promoted. (*Id.*) Flax was ultimately promoted to the position of master family service specialist. (D.I. 97, 64).

In 2000, Flax applied for the positions of family crisis therapist supervisor and family service program support administrator. (D.I. 96, 78-80.) Flax qualified for the positions and his name was placed on the register. (*Id.*) The record reflects that Flax applied for a position in DFS, Weekend/Holiday Unit, but was informed on March 3, 2001, that he was not hired for the position. (D.I. 98, ex.) Additionally, Flax was interviewed for vacancies within the DFS, on unknown dates and at unknown locations. (D.I. 35, Response 9.) Flax could have been placed on the certification list for a supervisory position at the Elwyn office and a FCT sexual abuse supervisor position, but the State denies that Flax was qualified in contrast to other applicants. (D.I. 149, Responses 15, 16.) Flax testified that there were management and supervisory openings in the DFS, that he applied for the positions, but the State did not notify him or consider him. (D.I. 105, 21-22.) Flax testified that persons less qualified than he were promoted. (*Id.* at 22.) Flax specifically mentions a position for which he applied that had a closing date of October 24, 2000. (*Id.* at 32-33.)

-2-

administrator of the Office of Children Services and next in command is Carlyse Giddins ("Giddins"), director of the DFS. (D.I. 161, 41; D.I. 167, 2.) Laura Boxwill ("Boxwill"), assistant regional administrator at the Elwyn office, testified on January 25, 2005, that of the eight supervisors at the office, there was one male and one African American. (D.I. 97, 26.) As of that date, Flax's position was occupied by a white female. (*Id.* at 30.)

Flax was injured in a work-related motor vehicle accident on February 22, 2001. At the time of his injury, Flax held the position of a master family service specialist. Following the accident, Flax's primary care physician, Charles Esham, M.D. ("Dr. Esham"), placed him off work and referred him to Craig Sternberg, M.D. ("Dr. Sternberg") for a physical therapy program. Upon the State's request, on August 22, 2001, Flax was examined by Mohammad Kamali, M.D. ("Dr. Kamali"). Dr. Kamali reported that Flax could return to work with a fifteen pound lifting restriction. (D.I. 89, ex. 1.) In the meantime, on October 24, 2001, Dr. Sternberg prepared a note that Flax could not return to work for the next six weeks. (D.I. 89, ex. 1; D.I. 222, 27, 62.) Flax was notified by Roberts via a letter dated October 26, 2001, that the lifting restriction could be accommodated and that Flax should return to work on November 5, 2001, or he should submit further medical information. (D.I. 89, ex. 1.) Dr. Sternberg continued to write notes that Flax was unable to work. (*Id.*)

Flax submitted a merit grievance on January 11, 2002, complaining that his pay had been reduced. (D.I. 89, ex. 1.) Susan Jones ("Jones"), the human resources representative, responded to Flax's complaint and explained to him that he had received double pay in error and, as a result,

-3-

the overpaid monies were being deducted from his pay.[3] (D.I. 96, 128-133.)

On March 26, 2002, Dr. Esham authored a note that Flax could return to work with the following restrictions: not more than six hours of work per day, sedentary work only, no driving, no lifting over twenty pounds, the need to take medication and, at times, lie down. (D.I. 89, ex. 1.) When asked what his job involved physically, Flax testified that he would visit families, conduct interviews, transport children to appointments with therapists, make telephone contacts, follow-up and school contacts, and interview teachers and other providers.[4] (D.I. 222, IAB Tr. 14-15.) Flax testified that weekly duties as a treatment worker included using a vehicle to visit various homes or locations to provide service or follow-up and that three-quarters of his time consisted of working in the field or using a vehicle. (*Id.* at 15.)

Flax attempted to return to work in March 2002.[5] Charkow and Roberts had numerous conversations about Flax and Roberts spoke to Charkow in March 2002 regarding a possible reasonable accommodation for Flax. (D.I. 161, at 42, 47.) Roberts showed Charkow a note from

---

[3]This reduction or garnishment of pay appears to be the basis for Flax's claim under the NLRA.

[4]Flax provided this testimony to the Industrial Accident Board ("IAB") on October 7, 2002. At the time he was seeking additional workers' compensation benefits. The IAB denied the petition for total compensation, with the exception that it awarded Flax payment of his outstanding medical bills. *Flax v. Delaware*, IAB No. 1187408 at 2 (Oct. 18, 2002); (D.I. 223.) The decision was affirmed by the Delaware Superior Court and the Delaware Supreme Court. *Flax v. Delaware*, C.A. No. 02A-11-002 RSG, 2003 WL 21976582 (Del. Super. Ct. Aug. 15, 2003), *aff'd, Flax v. Delaware*, 852 A.2d 908, 2004 WL 1535816 (Del. 2004).

[5]Roberts was unaware if Flax reported to work in March after submitting a return to work slip. (D.I. 167, 42.) She testified that if he reported, Flax did not come to her office, and that there was no agreement for Flax to return to work and, therefore, no authorization for him to return to work. (*Id.* at 43.) Roberts did not recall Flax being sent to her office by Nicole Stokes ("Stokes"), did not recall telling Flax to report to the human resources person, and did not recall any conversation with Flax. (*Id.* at 43-45.)

-4-

Flax's doctor and opined that Flax could not perform the essential functions of the job. (*Id.* at 48.) The note Roberts was given in March 2002 indicated that Flax could not return to work full-time, that he could work only six hours, and that he could do no driving. (*Id.* at 45) The restriction of no driving meant than an essential function of the position could not occur. (*Id.*) Roberts and Charkow made the decision that the doctor's restrictions did not allow Flax to perform the function of a master family service specialist or any case worker position. (*Id.* at 44.) The decision was made based upon the expectations of the job and the restrictions that the doctor specified. (*Id.* at 45.) When asked by Flax, why, with his background, experience, and performance evaluation, she did not allow him to return and negotiate work or make a reasonable accommodation to return to work, Roberts stated that he was not allowed to return to work because based upon the restrictions given by his physician he could not perform the essential functions of the job. (*Id.* at 48.) Roberts explained that social workers spend seventy-five percent of their time in the field and the remaining twenty-five percent on the telephone. (*Id.* at 49.) Roberts explained that she did not believe that with the combination of all restrictions the job could be completed. Charkow also spoke to Jones, who agreed. (*Id.* at 45, 48.) According to Charkow, because a master family specialist is responsible for serving families throughout the county and requires travel, one cannot always travel to the same area with another employee. (*Id.* at 54.)

A few weeks later, in a note dated April 16, 2002, Dr. Sternberg determined that Flax could drive for fifteen minutes. (D.I. 96, 103; D.I. 222, 56; D.I. 223, 7.) Roberts testified that Flax subsequently reported to work, but left the same day as there had been no discussion of his return. (D.I. 222, 56, 63.) Later, Flax met with Jones and Norwood Coleman ("Coleman"), the

-5-

diversity, EEO, and affirmative action administrator. (D.I. 96, 104.) Following the meeting,
Coleman authored an e-mail stating, "I believe Mr. Flax when he says he can return to work with
most of the restrictions imposed by his doctor. I also believe that Mr. Flax should be able to
drive while on the job on a limited basis. However, it is my recommendation that Mr. Flax not
be permitted to return to work without his physician removing the 'no driving while working'
restriction. As we discussed, Mr. Flax needs to discuss with his physician his belief that he could
drive with restrictions as part of his work duties. Since driving is an essential function of Mr.
Flax's position as a Family Services Specialist, he will need his doctor's written permission to
perform this task before he returns to work." (D.I. 96, ex. 15.) In dispute is whether Flax
acknowledged that it was not possible to drive out of town within fifteen minutes or that he could
not perform the job. (D.I. 96, 105-106.)

Charkow was aware of the subsequent doctor's note about driving no more than fifteen
minutes at a time. (D.I. 161, 62.) With regard to Coleman's e-mail, Charkow testified that the
decision not to return Flax to work stood even after his physician turned in or submitted the
revised medical note. (*Id.* at 65.) Roberts testified that even with the fifteen minutes driving
allowed, an employee could not perform the essential functions of a social work job of a family
service specialist. (D.I. 167, 52.) This decision was based upon Flax's job description and the
doctor's notes. (D.I. 168, 16.)

On May 15, 2002, Roberts wrote to Flax and advised him that he had exhausted the no
fault and leave benefits and was being placed on leave without pay. Flax was further advised
that he should contact her no later than May 31, 2002 regarding his work status. On May 21,
2002, Dr. Esham certified that Flax was totally disabled from his regular occupation and for any

-6-

occupation. (D.I. 161, ex. 1.) The statement indicates that Flax was first disabled on February 22, 2001. (*Id.*) Flax was removed from the payroll on May 31, 2002. (D.I. 105, 24.) At the time of his deposition on April 6, 2005, Flax had no evidence that he was removed from the payroll because of his race, age, or alleged disability. (D.I. 105, 26-27.)

Flax submitted a second grievance on June 3, 2002, claiming unfair labor practices and alleged discrimination based upon his disability. The grievance was received by Charkow's office. (D.I. 169, 56.) Flax sought recovery of sick and vacation time that was not part of an approved reduction, refund of entitled waiver of premiums, copies of sick and vacation leave policies, and placement on the payroll. (D.I. 96, ex. 11.) The document was never processed as a grievance because the State did not consider it an official grievance, since it was something that should have been, but was not, handled by the union. Therefore, no action was taken. (D.I. 168, 40; D.I. 169, 58.)

Susan McNamara ("McNamara"), was a deferred compensation specialist for the State during the time in question. (D.I. 95.) McNamara spoke to Jones after Flax contacted McNamara and told her he was no longer receiving payment from the State. (*Id.* at 4.) McNamara was informed that Flax had exhausted his accrued sick and vacation leave and workers' compensation entitlement, and was out on leave without pay. (*Id.* at 5.) McNamara's handwritten notes dated June 5, 2002, state that "he will be terminated for inability to perform his duties shortly." (D.I. 95, ex. 2.) On June 5, 2002, Flax applied for Social Security disability benefits. The application states that he was unable to work due to disability that began on February 22, 2001. (D. I. 105, ex. 5.)

A meeting was held with Flax on July 9, 2002. Prior to the meeting Charkow and Jones

discussed Flax's interest in applying for disability and whether the State could find a limited term
assignment so that he could qualify for a disability pension. (D.I. 168, 61.) During the meeting
Flax was offered a non-driving office job in records and statistics, working six hours per day.
(D.I. 223, 5.) At the meeting, Flax received a letter from Charkow, dated July 8, 2002, stating
that according to medical information provided by Flax, he was unable to perform the essential
functions of a master family service specialist due to his inability to drive. (D.I. 168, 61; D.I.
207.) The letter stated that Flax indicated a desire to apply for a disability pension but required
additional time on the job to qualify. (*Id.*) The letter stated, "because of our mandate to ensure
that children under our protection are safe from harm, I am unable to permanently allocate a case
carrying position to accommodate your situation. However, operational needs are such at the
current time that there is a limited term assignment that would meet the needs of the agency and
provide you with sufficient time to allow you to apply for a disability pension." (*Id.*) The letter
goes on to state that "this temporary assignment is being provided as an accommodation for you
in an attempt to secure the two months of service needed to apply for a disability pension should
you continue to be unable to perform the essential [f]unctions of the job of Master Family
Service Specialist. . . . It is unfortunate that we are unable to provide you an extended
accommodation; however, your position of Master Family Service Specialist with the agency is
needed to provide critical client services." (*Id.*) Flax testified that this was the only position
offered that was different from the job that he held at the time of the injury. (D.I. 222, 33.)
Charkow did not consider a lateral transfer to a lesser, non-driving job, because there are no non-
driving jobs in the family service specialist series. (*Id.* at 68.) Charkow did not know if Flax
was qualified for a position that would have entailed a promotion, but assumed he would have

-8-

been qualified to compete for such a position.[6] (*Id.* at 69.)

Flax performed the limited term assignment from July 9 through September 9, 2002. Flax testified that he did not return after that date because he was not able to fulfill the full-time duties of his position. (D.I. 222, 20.) There is no documentation that Flax said he could not do the job anymore, but on many occasions he stated that he was in "too much pain." (D.I. 89, 42.) According to Roberts, Flax did not make a request for an accommodation. (D.I. 161, ex. 3 at 18.) Roberts testified when Flax left state employment his physician indicated that he was totally disabled from being able to work. (D.I. 168, 28.) Robinson explained that the formal information received was that Flax was totally disabled and, if this was the case, an accommodation did not apply. (*Id.*) Following the assignment Flax was credited with five years of service and obtained eligibility to apply for a State employee disability pension.

In pursuing Social Security disability benefits, Flax completed a work activity report dated August 9, 2002. (D.I. 206.) It states that Flax was provided a limited term assignment because of his medical condition. (*Id.*) He was allowed to work at a lower standard of productivity, was given the job based upon his past services to his employer, and worked irregular hours or took frequent rest periods. (*Id.*) The work activity report stated that Flax was given a special assignment that allowed him to potentially qualify for a disability pension. (*Id.*) The work was at a lower standard of productivity based upon his previous experience with his employer. (*Id.*) Flax stated that his employer acknowledged his restrictions and limitations in the assignments he was given. (*Id.*) Flax stated that he utilized medical equipment and aids

_____

[6]Charkow was unaware that Flax had a master's degree and testified that she did not meet Flax until July 2002. (*Id.* at 21, 40.)

during the period of work to help complete his task, and his employer allowed him to work at regular pay. (*Id.*) Flax was awarded Social Security disability benefits on July 6, 2002, with a finding that he became disabled under Social Security rules on February 22, 2001. (D.I. 105, ex. 4.) On September 9, 2002, Dr. Esham noted that Flax "has been totally disabled since February 28, 2001. (D.I. 96, ex. 13.) On September 26, 2002, Flax applied for a State employee disability pension, and it was granted effective January 1, 2003. (D.I. 105, ex. 4.)

On November 25, 2002, Flax filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), and on July 10, 2003, the EEOC issued Flax a right to sue letter. (D.I. 2; D.I. 106, 16, ex. 2.) Flax charged that following a work related accident his employer refused to allow him to return to work as a master family service specialist with the reasonable accommodations ordered by his doctor; he was removed from the payroll effective May 31, 2002, because he had been out of work for over one year; in June 2002 he applied for Social Security disability, and his employer allowed him to return to work on special projects so that he could qualify for his pension; he was awarded Social Security disability in July 2002 and retired from his state position in September 2002. (D.I. 206.) Flax claimed discrimination based upon his race, age, and disability when he was denied reinstatement to his social worker position. He claimed a white employee was transferred when she became disabled, that his employer chose to replace him with a younger social worker, and he was retaliated against for filing a union grievance regarding salary issues based upon discrimination. (D.I. 206.) The charge made no reference to promotions. (D.I. 105, 30.)

Flax alleges in his amended complaint that discriminatory conduct occurred in connection with his employment at the Elwyn office at the earliest on May 31, 2002, and at the latest on

-10-

October 1, 2002. (D.I. 73, ¶¶ 4, 5.) Flax alleges unfair and unnecessary discrimination by removing him from the payroll; subjecting him to psychological and financial hardship for refusing to return him to the work environment; denying him job opportunities, including a promotion, standard services, and benefits pursuant to a bona fide employment benefit plan in violation of 42 U.S.C. § 12112; failure to make reasonable accommodations in violation of 42 U.S.C. § 1981a; retaliation under the ADA, 42 U.S.C. § 12203; failure to consider employment of an individual with a disability pursuant to 29 U.S.C. § 791; unfair labor practices as defined by 29 U.S.C. § 158; failure to consider his disability income as defined by 15 U.S.C. § 1673; and failure to comply with Delaware laws regarding disability pay pursuant to 15 U.S.C. § 1677. (D.I. 2, ¶ 9; D.I. 73, ¶ 9.) Flax seeks injunctive relief consistent with the court's interpretation of unlawful employment practices and compensatory damages.

The State raises three grounds for summary judgment: (1) it is entitled to Eleventh Amendment immunity on the claims raised under the ADA, 42 U.S.C. §§ 12112 and 12203; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 through 634; 29 U.S.C. §§ 158 and 791; 42 U.S.C. § 1981; and 15 U.S.C. §§ 1673 through 1677; (2) the claims under the NLRA, 29 U.S.C. § 791 and the garnishment provisions of the Consumer Credit Protection Act, 15 U.S.C. §§ 1673 through 1677 fail to state a legal claim or a *prima facie* case; and (3) Flax has failed to establish a *prima facie* case of discrimination under Title VII or any other provision. Flax responds that he has met his: 1) *prima facie* burden of proof; 2) pretext burden; and 3) burden on his retaliation claim.

## III. STANDARD OF REVIEW

The court shall grant summary judgment only if "the pleadings, depositions, answers to

-11-

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). However, a party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

### A. Eleventh Amendment Immunity/Failure to State a Claim

The State contends that it is immune from suit by reason of its Eleventh Amendment immunity from the following claims: 42 U.S.C. § 1981 for failure to make a reasonable accommodation; the ADA, 42 U.S.C. §§ 12101 through 12117 and §12203(a) for failure to

promote, denial of job opportunities, and retaliation; the Rehabilitation Act of 1973, 29 U.S.C. §

791, for failure to consider employment of an individual with a disability; the NLRA, 29 U.S.C.

§ 158 for unfair labor practices; the Consumer Credit Protection Act, 15 U.S.C. §§ 1673 through

1677, for failure to consider Flax's disability income and for failure to comply with Delaware

law regarding disability pay; and the ADEA, 29 U.S.C. §§ 621 through 634.  It also seeks

summary judgment on the basis that Flax's claims under the NLRA, the Rehabilitation Act, the

garnishment provisions of the Consumer Credit Protection Act, and 42 U.S.C. § 1981 fail to state

a legal claim.

At the outset, the court notes that it is well-settled that "[a]bsent a state's consent, the

Eleventh Amendment bars a civil rights suit in federal court that names the state as a defendant."

*Laskaris v. Thornburgh*, 661 F.2d 23, 25 (3d Cir. 1981)(citing *Alabama v. Pugh*, 438 U.S. 781

(1978)).  The State of Delaware has not waived its sovereign immunity under the Eleventh

Amendment.  *See Brooks-McCollum v. Delaware*, 213 Fed. Appx. 92, 94 (3d Cir. 2007);

*Rodriguez v. Stevenson*, 243 F. Supp. 2d 58, 63 (D. Del. 2002).  The Eleventh Amendment,

however, permits suits for prospective injunctive relief against state officials acting in violation

of federal law.  *Ex parte Young,* 209 U.S. 123 (1908).  "This standard allows courts to order

prospective relief, as well as measures ancillary to appropriate prospective relief." *Frew v.

Hawkins,* 540 U.S. 431, 437 (2004) (internal citations omitted).  "Federal courts may not award

retrospective relief, for instance money damages or its equivalent, if the State invokes its

immunity."  *Id.* (citations omitted).

The complaint and amended complaint seek for injunctive relief "consistent with the

court's interpretation of unlawful employment practices."  (D.I. 2, 73.)  Flax's general claim for

injunctive relief is not the type of injunctive, "forward-looking" relief cognizable under *Ex parte Young*. Rather than seeking reinstatement or an accommodation for his disability, Flax seeks compensatory and liquidated damages and, therefore, the State is immune from Flax's injunctive relief claim. *See Koslow v. Pennsylvania*, 302 F.3d 161 (3d Cir. 2002).

### 1. Americans with Disabilities Act

Flax raises ADA claims pursuant to Title I of the ADA, 42 U.S.C. § 12112, failure to promote and deny job opportunities and Title V of the ADA, 42 U.S.C. § 12203, for retaliation. Title I of the ADA prohibits employment discrimination against the disabled, while Title V governs retaliation claims.

The law is settled that Flax may not recover in federal court under Title I of the ADA for his discrimination claims against the State. Congress may abrogate the States' Eleventh Amendment immunity when it unequivocally intends to do so "and acts pursuant to a valid grant of constitutional authority." *Board of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) (internal quotation marks and alteration omitted). In *Garrett*, the Supreme Court invalidated Congress' abrogation of the States' immunity to claims under Title I of the ADA. *Id.* at 374. Accordingly, under the Eleventh Amendment, the State is immune from suit for damages brought pursuant to Title I of the ADA. *See Garrett*, 531 U.S. at 330; *Benn v. First Judicial Dist. of Pa.*, 426 F.3d 233, 241 (3d Cir. 2005). Therefore, the court will grant the State's motion for summary judgment to the extent that Flax seeks damages under Title I of the ADA.

The State argues that it is immune from suit for claims under Title V, for the same reasons that it is immune from suite under Title I. Neither the Third Circuit nor the Supreme Court have addressed the issue of Eleventh Amendment immunity under Title V of the ADA, 42

U.S.C. § 12203, and courts have reached differing results on the issue.  Some courts have found that retaliation claims under § 12203 are barred by the Eleventh Amendment. *See e.g., Demski v. Monteith*, 255 F.3d 986, 988-89 (9th Cir. 2001) (barring claim against state legislative committee raised under Title V of the ADA due to absence of legislative findings demonstrating pattern of retaliation by States); *accord Foster v. New Jersey Dep't of Transp.*, Civ. No. 04-101 MLC, 2005 WL 3542462 (D.N.J. Dec. 27, 2005); *Shabazz v. Texas Youth Comm'n*, 300 F. Supp. 2d 467, 472-73 (N.D. Tex. 2003) (barring ADA Title V claim based upon employment discrimination by state agency).  Others, however, have determined there is no Eleventh Amendment immunity. *See Sarjussuan v. West Virginia Bd. of Governors*, Civ. A. No. 05CV144, 2007 WL 1308978 (N.D.W. Va. May 3, 2007) (no Eleventh Amendment immunity for ADA Title V claim, at least where the claims are predicated on alleged violations of Title II); *Roberts v. Pennsylvania Dep't of Pub. Welfare*, 199 F. Supp. 2d 249, 254 (E.D. Pa. 2002) (no Eleventh Amendment immunity for ADA Title V claim given the asserted First Amendment violation and the ADA and Rehabilitation Act's retaliation provisions that serve to enforce the actual guarantees under § 1 of the Fourteenth Amendment).

Neither party adequately addressed the issue of the State's immunity under the retaliation provisions found in Title V of the ADA.  Because of the limited discussion by the parties, the court declines to rule on the issue.  Accordingly, the court will grant the motion for summary judgment to the extent that Flax seeks damages under Title I of the ADA and will deny without prejudice the motion for summary judgment regarding immunity under Title V of the ADA. Regardless, and as will be discussed below, Flax cannot survive summary judgment on the issue of retaliation under the ADA.

## 2. Age Discrimination in Employment Act

Although no specific statute is mentioned, the complaint alleges employment discrimination on the basis of age. Under the ADEA, "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a). The ADEA includes in its definition of employer "a State or political subdivision of a State. 29 U.S.C. § 630(b)(2). The Supreme Court held in *Kimel v. Florida Bd. of Regents*, 528 U.S. 62 (2000) that Congress did not validly abrogate the states' sovereign immunity to suits by private individuals for suits filed pursuant to the ADEA. Therefore, the State is immune from suit for damages under the Eleventh Amendment for Flax's age discrimination claim under the ADEA. To the extent that Flax raises a claim under the ADEA, the court will grant the State's motion for summary judgment on the basis of Eleventh Amendment immunity.

## 3. National Labor Relations Act

Flax alleges that his rights were violated when the State subjected him to unfair labor practices in violation of the NLRA, pursuant to 29 U.S.C. § 158. Once again, the State asserts that it is immune from suit under the Eleventh Amendment.

It has been held that states have Eleventh Amendment immunity from claims raised against them under the NLRA. *Ahmed v. Peralty Comty. Coll. Dist.,* No. C 02-5532 MJJ, 2003 WL 1344636 (N.D. Cal. 2003). Moreover, Section 2(2) of the NLRA specifically exempts "any State or political subdivision thereof" from its coverage. 29 U.S.C. § 152(2). In enacting the NLRA, Congress clearly intended to exempt governmental entities from coverage when the

-16-

government is acting as an employer. *See National Labor Relations Bd. v. Natural Gas Utility Dist.*, 402 U.S. 600 (1971) (county gas utility district was a political subdivision that was not subject to the NLRA); *Stinson v. Delaware River Port Auth.*, 935 F. Supp. 531 n.2 (D.N.J. 1996) (claims brought under 29 U.S.C. § 158 are within the exclusive jurisdiction of the National Labor Relations Board, and the district court has no subject matter jurisdiction to adjudicate these claims (citing *Confederated Indep. Unions v. Rockwell*, 465 F.2d 1137 (3d Cir. 1972)).

Accordingly, the State is excluded as an employer under the NLRA, and this court has no subject matter jurisdiction. Therefore, the court will grant the motion for summary judgment on the claims raised under the NLRA.

### 4. Rehabilitation Act

Flax raises a claim under 29 U.S.C. § 791 of the Rehabilitation Act claiming that the State failed to consider the employment of an individual with a disability. This section of the Rehabilitation Act prohibits discrimination on the basis of disability by federal agencies in the employment context. 29 U.S.C. § 791. The State moves for summary judgment on the basis that it is immune from suit under § 791. Flax opposes the motion and appears to argue that his claim is brought under 29 U.S.C. § 794 and, because the State is the recipient of federal financial assistance, it is not immune from suit.[7]

Flax filed his Rehabilitation Act claim under § 791, not § 794, and did not amend his complaint to state a claim under § 794. Notably, during a court conference held on September 20, 2006, the court advised Flax that the time to amend his complaint had passed and stated,

_____

[7]During her deposition, Roberts stated that the DFS receives some federal funds. (D.I. 167, 3.)

-17-

"we're at the stage of dispositive motions, and that means not only are the pleadings at this point supposed to be set but the parties' discovery is over and we're talking about legal positions based on a set record . . . . Your pleadings are in place. Those are the pleadings that the defendant has moved for summary judgment based on. I can't, in fairness, allow that to change at this point." (Sept. 20, 2006. Tr. 6-7.) While the state may waive its immunity under § 794 by accepting certain federal funds, a claim under that section is not before the court.

Section 791, in pertinent part, requires the federal government (1) in its role as an employer, to develop and implement affirmative action plans for disabled individuals, 29 U.S.C. § 791(b); and (2) to "encourage" state agencies to adopt and implement "policies and procedures which will facilitate the hiring, placement, and advancement in employment of individuals who have received rehabilitation services," *id.* § 791(c). The private enforcement mechanism for § 791 of the Rehabilitation Act is located at 29 U.S.C. § 794a(a)(1). *Gardner v. Morris*, 752 F.2d 1271, 1277 (8th Cir.1985); *Bracciale v. Philadelphia*, Civ. A. No. 97-2464, 1997 WL 672263, at *2 (E.D. Pa. Oct. 29, 1997). It provides that "[t]he remedies, procedures, and rights set forth in [42 U.S.C. § 2000e-16], including the application of [42 U.S.C. §§ 2000e-5(f) through (k)], shall be available, with respect to any complaint under section 791 . . . to any employee or applicant for employment aggrieved by the final disposition of such complaint, or by the failure to take final action on such complaint." 29 U.S.C. § 794a(a)(1). Section 2000e-16 of Title 42, is entitled "Employment by Federal Government," and applies only to federal employees. *See Brown v. General Serv. Admin.,* 425 U.S. 820, 835 (1976). The remaining sections of Title 42 referenced in the enforcement mechanism merely concern matters such as the functioning of the Equal Employment Opportunity Commission, appointment of counsel, attorney fees, jurisdiction,

and the availability of relief.

It is clear from the language of § 791 and from its enforcement mechanism, that a cause of action under § 791 is available only to federal employees. It does not establish a private cause of action for a state employee suing a state employer. Because Flax is a state employee suing a state employer, his claim under § 791 of the Rehabilitation Act of 1973 fails. Therefore, the court will grant the State's motion for summary judgment on the claims raised under 29 U.S.C. § 791.

### 5. 42 U.S.C. § 1981a

Flax alleges that the State failed to provide him a reasonable accommodation in violation of 42 U.S.C. § 1981a. The State moves for summary judgment on the claims raised against it under 42 U.S.C. § 1981 on the basis that it is entitled to Eleventh Amendment immunity.

At the outset, the court notes that Flax does not raise a claim under § 1981. Rather, he seeks recovery pursuant to § 1981a. The great weight of authority holds that § 1981a does not create an independent cause of action, but only serves to expand the field of remedies for plaintiffs in Title VII suits. *Pollard v. Wawa Food Mkt.*, 366 F. Supp. 2d 247, 251 (E.D. Pa. 2005) (citing *Rotteveel v. Lockheed Martin Corp.*, Civ. A. No. 01-6969, 2003 WL 21956426, at *3 n.6 (E.D. Pa. July 15, 2003) ("Section 1981a does not create an independent cause of action, but rather, provides for the recovery of additional damages in an employment discrimination claim). *Huckabay v. Moore*, 142 F.3d 233, 241 (5th Cir. 1981); *Rotteveel*, 2003 WL 21956426, at *3 n.6); *Perry v. Dallas Indep. School Dist.*, Civ. A. No. 96-CV-2855D. 1998 WL 614668, at *1 n.1 (N.D. Tex. Sept. 2, 1998) (There is no such thing as a 1981a claim. Section 1981a merely enhances the remedies otherwise available for intentional employment discrimination."); *Powers*

*v. Pinkerton, Inc.*, 28 F. Supp. 2d 463, 472 (N.D. Ohio 1997) ("[A] claim based on § 1981a does not afford an independent ground for relief but is a statutory provision for additional recovery of damages in Title VII cases."); *Krouse v. American Sterilizer Co.*, 984 F. Supp. 891, 899 (W.D. Pa.1996) (" Section 1981a allows for the recovery of compensatory and punitive damages in cases involving intentional employment discrimination under Title VII or ADA, but it does not confer any independent cause of action."); *Presutti v. Felton Brush, Inc.*, 927 F. Supp. 545, 550 (D.N.H. 1995) (" Section 1981a is not intended to stand alone as an independent cause of action."); *Swartzbaugh v. State Farm Ins. Cos.*, 924 F. Supp. 932, 934 (E.D. Mo. 1995) (Section 1981a does not create an independent cause of action, but merely provides for additional relief in Title VII suits.); *West v. Boeing Co.*, 851 F. Supp. 395, 398-401 & n.7 (D. Kan. 1994) (" § 1981a does not, either expressly or impliedly, create an additional, separate and independent cause of action for employment discrimination plaintiffs, but merely adds to the damages available to such plaintiffs under Title VII."). Based upon the foregoing, Flax cannot state a claim upon which relief may be granted under § 1981a.

To the extent that Flax raises a 42 U.S.C. § 1981 claim against the State, it is immune from suit pursuant to the Eleventh Amendment. The Supreme Court held that § 1981 did not abrogate the States' Eleventh Amendment immunity and that the Eleventh Amendment bars an action brought by an employee against the State under federal civil rights statute 42 U.S.C. § 1981. *Will v. Michigan Dep't. of State Police*, 491 U.S. 58, 67 (1989); *Quern v. Jordan*, 440 U.S. 332, 345 (1979); *Collins v. Sload,* 212 Fed. Appx. 136, 141 (3d Cir. 2007); *Cimino v. Delaware Dep't of Labor*, Civ. A. No. 01-458 (GMS), 2002 WL 265095, at *5 (D. Del. 2002).

Flax cannot state a claim under § 1981a, and the State is immune from suit for actions

raised under § 1981. Therefore, the court will grant the State's motion for summary judgment as a matter of law for claims raised against it under 42 U.S.C. § 1981 and will dismiss, *sua sponte*, any claim raised pursuant to § 1981a for failure to state a claim upon which relief may be granted.

### 6. Consumer Credit Protection Act - Garnishment Provisions

Flax raises claims pursuant to 15 U.S.C. §§ 1673 through 1677, the garnishment provisions of the Consumer Credit Protection Act. The court will not address the issue of Eleventh Amendment immunity, since as discussed below, the statute does not provide a private cause of action.

Although not addressed by the Third Circuit, several courts have held that the Consumer Credit Protection Act does not provide for a private cause of action under Subchapter II of the Act. *Colvert v. Roling*, 233 Fed. Appx. 587 (8th Cir. 2007) (a private right of action does not exist under Consumer Credit Protection Act section governing restrictions on garnishment of wages); *Le Vick v. Skaggs Cos.*, 701 F.2d 777 (9th Cir. 1983); *Snapp v. United States Postal Serv.*, 664 F.2d 1329 (5th Cir. 1982); *McCabe v. Eureka*, 664 F.2d 680 (8th Cir. 1981); *Agg v. Flanagan*, 855 F.2d 336 (6th Cir. 1988) (opining in dissent that there is no implied private cause of action for damages resulting from violation of statute setting maximum limit upon amount of wages which can be garnished under the Consumer Credit Protection Act, 15 U.S.C. § 1673); *Cf. Western v. Hodgson*, 494 F.2d 379, 380 (4th Cir. 1974) (expressly refusing to reach the question whether a private right of action exists because the facts of that case would not merit relief in any event). In analyzing the claims raised, the foregoing courts have noted that § 1676 (also part of Subchapter II) provides that " 'the Secretary of Labor . . . shall enforce provisions of this

-21-

Subchapter.'" *Le Vick*, 701 F.2d at 779 (quoting 15 U.S.C. § 1676). Inasmuch as there is no implied private right of action under the garnishment provisions of the Consumer Credit Protection Act, the court will grant the State's motion for summary judgment for failure to state a claim upon which relief may be granted.

## B. Title VII Race Discrimination

The State argues that Flax's Title VII race discrimination claim cannot survive summary judgment.[8] When a plaintiff does not present direct evidence of discriminatory animus, courts analyze a plaintiff's claims pursuant to a pretext theory of discrimination and apply the *McDonnell Douglas* burden shifting analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Pursuant to *McDonnell Douglas*, a plaintiff has the initial burden to establish a *prima facie* case of discrimination. *Id.* at 802. In order to show a *prima facie* case of racial discrimination, Flax must illustrate that: (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the circumstances of the adverse employment action give rise to an inference of discrimination. *See Johnson v. Keebler-Sunshine Biscuits, Inc.*, 214 Fed. Appx. 239, 241 (3d Cir. 2007); *Jones v. School Dist. of Phila.*, 198 F.3d 403, 410-11 (3d Cir.1999).

Once Flax establishes a *prima facie* case of discrimination, the burden of production shifts to the State, and it must "articulate some legitimate, nondiscriminatory reason" for the adverse employment decision. *McDonnell Douglas*, 411 U.S. at 802. The State's burden to prove a legitimate non-discriminatory reason is "relatively light." *Johnson v. Keebler-Sunshine*

---

[8]The court will not address the age and disability discrimination issues inasmuch as the State is immune from suit.

-22-

*Biscuits, Inc.*, 214 Fed. Appx. at 242. If the State meets this burden, the burden again shifts to

Flax to demonstrate, by a preponderance of the evidence, that the State's rationale is pretextual.

*McDonnell Douglas*, 411 U.S. at 804. To do this, Flax must "point to some evidence, direct or

circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's

articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more

likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*,

32 F.3d 759, 764 (3d Cir. 1994). If the State carries this burden, the presumption of

discrimination drops from the case, and Flax must "cast sufficient doubt" upon the State's

proffered reasons to permit a reasonable fact finder to conclude that the reasons are fabricated.

*See Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996) (en banc).

     The State concedes that Flax is a member of a protected class, and that prior to his

automobile injury, he was qualified for the position of master family services specialist. The

State posits that, based upon his complaint, and the allegations of discrimination from May 31,

2002 to October 1, 2002, the adverse action must be Flax's removal from the State's payroll, on

May 31, 2002. The EEOC charge also states that he was discriminated against based upon his

race when he was denied reinstatement to his social worker position. The State contends that the

purported adverse actions were not made under circumstances that give rise to an inference of

unlawful discrimination. Rather, Flax was taken off the payroll because he had used all of his

sick and vacation leave. The State further argues that none of the witnesses named by Flax

support his claim of discrimination. The witnesses included Jones, Charkow, Roberts, Michael

Sullivan ("Sullivan"),[9] Coleman, Boxwill, Giddins, and Debra Lawhead ("Lawhead").[10] Coleman, Roberts, and Giddins are African American. (D.I. 166, ex. 2). Indeed, Giddins, Coleman, Sullivan, Jones, Boxwill, Lawhead, and Roberts each testified that Flax was not treated differently because of his race, age, gender or disability. (D.I.89, 61-62; D.I. 92, 38-41; D.I. 93, 38; D.I. 94, 53-54; D.I. 96, 147-148; D.I. 97, 60-61; D.I. 168, 50-51.)

Flax responds that he has made a *prima facie* case of discrimination. Flax argues the adverse employment actions consist of delay and denial of promotions, and lower salary increases and contends that similarly situated employees, outside the protected class, non-minority and with physical limitations, received accommodations, were promoted, received pay raises, and were in higher grades and received higher salaries than he did. Flax relies upon grievances he filed in 1997 to support his claim of race discrimination claiming that the same racial issues resurfaced at the Elwyn office subsequent to his transfer there in 1999. Flax argues that, even assuming the State has articulated legitimate non-discriminatory reasons for its actions, there are "too many facts for there to be an innocent explanation." (D.I. 204 at 16.) Flax points to suspicious timing, ambiguous statements, and the behavior directed towards him, as follows: eight co-workers, with less seniority, and all but one who were not in a protected class, were promoted to family crisis therapist or supervisor; as of May 15, 2002, Flax made $4,000 less per year than his next-closest co-worker, both of whom are white, and thirty-three family service

---

[9]Sullivan was a union representative during the relevant time period. (D.I. 92, 2.)

[10]In February 2001 and July 2002, Lawhead held the position of Insurance Coverage Officer. (D.I. 94, 2.)

-24-

workers in his division and region and with less seniority than Flax, made more than he did.[11]

The State argues that Flax's claim for failure to promote and other alleged incidents occurred long before the 300 days period prior to the filing of his November 25, 2002 EEOC charge of discrimination, said claims are not properly before the court, the claims were not presented in the charge of discrimination and, therefore, are not administratively exhausted.[12]  A review of the EEOC charge indicates this is true. Hence, even if Flax provided a fair characterization of what occurred, the claims are not properly before the court. As such, it is clear from the record that Flax failed to exhaust his failure to promote claim before the EEOC. 42 U.S.C. § 2000e-5(e)(1) (filing EEOC charge is statutory prerequisite to bringing civil action); *Antol v. Perry*, 82 F.3d 1291, 1295-96 (3d Cir. 1996) (discrimination claim barred where specifics of EEOC charge did not "fairly encompass" particular allegations).

Regardless, Flax failed to present sufficient evidence to give rise to an inference of discrimination. Flax relies upon a grievance filed in 1997 prior to the time he was ever employed by the State. He argues, but provides no facts, that employees were treated differently from him. While Flax referred to certain documents to support his position, the documents did not contain the information Flax stated was contained therein.

Assuming arguendo that Flax had established a *prima facie* case of discrimination, his claim would still fail for lack of evidence of pretext. Proving pretext places a "difficult burden"

---

[11]In making this argument Flax cites to his and Charkow's deposition, exhibit 5.  (D.I. 105, 31-32; D.I. 169, ex. 5.)  The deposition transcript pages make no reference to the races of the individuals in question, and Charkow's exhibit 5 does not indicate the age of the employees or the wages of the employees.

[12]There is evidence in the record that Flax applied for certain positions, to no avail, the latest date occurring in March 2001.

-25-

on Flax. *Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 386 (3d Cir. 1999). Flax must show "not merely that the [State's] proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997). The State produced sufficient evidence that Flax was removed from the payroll because he was off work due to a work related injury; unable to perform the duties of his position, most notably the driving requirement as acknowledged by Flax and the State; and due to the length of time he was off work, had exhausted his no fault and leave benefits. Notably, Flax testified at his deposition that he had no evidence that he was removed from the payroll because of his race, age, or alleged disability. Moreover, the record is replete with testimony that Flax's position required that he spend three-quarters of his time working in the field or using a vehicle, and that his physicians concluded his medical condition restricted him from driving to the extent that he could only drive for fifteen minutes. Based upon this restriction, as well as others, the State concluded that Flax could not perform the essential functions of his job.

Nonetheless, Flax argues that the explanations given by the State are not worthy of belief, given evidence that contradicts their "claimed justification" as to why he was not allowed to return to work. At the summary judgment stage, however, the court may not weigh evidence or make credibility determinations. *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.,* 998 F.2d 1224, 1230 (3d Cir. 1993); *see Carpenter v. Proctor & Gamble Disability Benefit Plan & Benefit Plans Trust*, 229 Fed. Appx. 170 (3d Cir. 2007).

The court must discern whether the "real reason" for the State's actions was an intent to discriminate against Flax on the basis of race. *Simpson v. Kay Jewelers*, 142 F.3d 639, 647 (3d

-26-

Cir. 1998). Based upon the foregoing analysis, the court concludes that Flax has failed to proffer evidence that would suggest an invidious motive to discriminate based upon race. Therefore, the court will grant the State's motion for summary judgment on the issue of race discrimination.

## C. Retaliation

Flax alleges retaliation under two theories: (1) under the ADA, pursuant to 42 U.S.C. § 12203 and (2) as a result of his filing a union grievance regarding salary issues based upon discrimination. Flax specifically mentions the ADA in raising his retaliation claim. It is unclear if he alleges retaliation under Title VII. The court will, therefore, liberally construe Flax's complaint to include retaliation arising under both statutes.

### 1. Title VII

To establish a *prima facie* case of retaliation under Title VII, Flax must show that: (1) he engaged in activity protected by Title VII; (2) after or contemporaneous with engaging in that conduct, his employer took an adverse action against him; (3) the adverse action was "materially adverse"; and (4) there was a causal connection between his participation in the protected activity and the adverse employment action. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 2415 (2006); *Moore v. Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006); *Weston v. Pennsylvania*, 251 F.3d 420, 430 (3d Cir. 2001). A materially adverse employment action means "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at ----, 126 S.Ct. at 2415 (citation and internal quotation omitted). Whether an action is materially adverse "often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* With respect to the

-27-

causation prong, the court considers whether a reasonable jury could link the employer's conduct to retaliatory animus. *See Jensen v. Potter*, 435 F.3d 444, 449 n.2 (3d Cir. 2006) (explaining "[t]he ultimate question in any retaliation case is an intent to retaliate vel non"). In assessing this, the court considers the "temporal proximity" between the plaintiff's protected activity and the employer's allegedly retaliatory response, and "the existence of a pattern of antagonism in the intervening period." *Id.* at 450 (quotations and citations omitted).

The State argues this claim fails inasmuch as the only retaliation claim raised by Flax, was an allegation of retaliation due to the filing of a union grievance regarding his salary issue. The State argues this is not a protected activity under Title VII. It notes that since Flax filed his charge of discrimination on November 25, 2002, and all matters of which he complains had already occurred, they cannot be in retaliation for commencing the EEOC proceedings.

It is undisputed that before a plaintiff may seek judicial relief on a claim brought under Title VII, he must exhaust all administrative remedies which, in turn, requires the plaintiff to file a charge of discrimination with the EEOC within 180 days of the alleged unlawful employment practice, or within 300 days if the claimant also files a charge with a parallel state agency. *Burgh v. Borough Council of Montrose*, 251 F.3d 465, 469-70 (3d Cir. 2001); *Robinson v. Dalton*, 107 F.3d 1018, 1020 (3d Cir. 1997). "The purpose of requiring exhaustion is to afford the EEOC the opportunity to settle disputes through conference, conciliation, and persuasion, avoiding unnecessary action in court." *Antol v. Perry*, 82 F.3d 1291, 1296 (3d Cir. 1996). Moreover, a Title VII plaintiff may not assert a claim in a lawsuit that was not included in his EEOC charge unless the investigation of the charged discrimination would fairly encompass the uncharged claim. *Id.* at 1295, quoting *Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir. 1984) (per curiam).

*See also Shaver v. Corry Hiebert Corp.*, 936 F. Supp. 313, 319 (W.D. Pa. 1996) ("To be allowed in a district court action, claims not presented to the EEOC must usually allege not only discrimination on the same basis, but the same type of discriminatory behavior").

Flax's submitted two grievances: The first grievance, filed on January 11, 2002, complains about pay reduction, with no reference to any type of discrimination. The second grievance, submitted on June 3, 2002, complains of discrimination based upon disability, but makes no reference to race discrimination. Hence, the submission of the foregoing grievances was not a protected activity under Title VII. *See Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701-02 (3d Cir. 1995); *Walker v. Pepsi-Cola Bottling Co.*, Civ. A. No. 98-225-SLR, Civ. A. No. 99-748-JJF, 2000 WL 1251906, at *17 (D. Del. 2000). Accordingly, the court will grant the State's motion for summary judgment on Flax's Title VII retaliation claim.

### 2. ADA

Finally, Flax claims that the State retaliated against him for filing a union grievance. Flax's second grievance, filed in June 2002, complained that his employer practiced discrimination regarding his disability. ADA retaliation claims are analyzed under the same framework employed for retaliation claims arising under Title VII. *Montanye v. Wissahickon School Dist.*, 218 Fed. Appx. 126, 131 (3d Cir. 2007) (citing *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997). Section 12203(a) of the ADA prohibits discrimination against an employee when he "has opposed any act or practice made unlawful by this Act or because such individual made a charge, testified, assisted, or participated in any manner in an investigation . . . under this Act". 42 U.S.C. § 12203(a).

Even if it was not considered "an official grievance" by the State, the union grievance

-29-

Flax submitted on June 3, 2002, constituted protected activity under the ADA. *See Walker v. Pepsi-Cola Bottling Co.*, 2000 WL 1251906 (D. Del. 2000) (There is no dispute that filing grievances constituted protected activity under the ADA or that he suffered an adverse employment action (his dismissal) after filing grievances.) Having said that, it is unclear what adverse action was taken against Flax following the submission of the grievance. Flax had already been placed on leave without pay. Liberally construing Flax's amended complaint, it may be that the alleged adverse employment action was that he was not reinstated to his position as a social worker. Nonetheless, Flax's ADA retaliation claim falters on the causation prong of his *prima facie* case and, even if Flax had stated a *prima facie* case of retaliation, the record is devoid of pretext to rebut the State's assertion of nondiscriminatory reasons for the actions it took.

To state a *prima facie* case of retaliation, Flax must demonstrate "a causal connection between [his] participation in the protected activity and the adverse employment action." *Robinson v. Pittsburgh,* 120 F.3d 1286, 1299 (3d Cir. 1997) (abrogated on other grounds by *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). As the Third Circuit has explained, "the mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Id .* at 1302.

Initially, the court notes that in opposing the motion for summary judgment, Flax raises new theories of retaliation based upon a failure to promote including the State's refusal to conduct routine performance evaluations from January 1999 until 2000; undocumented withdrawals from his salary; denial of reasonable accommodations, isolation and no interaction

-30-

with his unit supervisor; reduction of accrued annual and sick leave; removal from the payroll; removal from his designated office space; restrictions on the amount of time allowed in returning to work; ignoring his right to leave under the Family Medical Leave Act; and assignment to the Central Office upon his return to work. Many of the acts occurred prior to the time that Flax submitted his June 2002 grievance while others occurred after the grievance was submitted. In the instant case, Flax's charge of discrimination filed with the EEOC alleges only that he was retaliated against for filing a union grievance regarding salary issues based on discrimination. (D.I. 1, EEOC Charge of Discrimination.) The charge is noticeably devoid of any other claims of retaliation.

Even if Flax engaged in protected activity, he cannot fulfill the third prong of the *prima facie* case to show there is a causal link between the protected activity and the State's decision to remove him from the payroll or failure to reinstate him to his former position. "[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a reasonable factfinder to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Harding v. Careerbuilder, LLC*, 168 Fed. Appx. 535, 537 (3d Cir. 2006) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994) (citation omitted)). Flax has not met this standard.

The evidence and documentation, deposition testimony, and most notably, records and notes of Flax's physicians indicate that Flax was unable to perform an essential function of his job. There is nothing before the court that contradicts the proffered reason Flax was placed on

-31-

leave without pay and/or was not reinstated to his former position.[13] Nor is the State's proffered

reason for its action so weak, incoherent, implausible, or inconsistent that a reasonable factfinder

could rationally find it unworthy of credence. *See Sarullo v. United States Postal Serv.*, 352

F.3d 789, 800 (3d Cir. 2003). Even construing the evidence in the light most favorable to Flax,

he has not provided evidence from which a fact finder could either disbelieve the State's

articulated reason, or believe that a discriminatory reason was more likely than not the cause of

the employment action. Accordingly, the court will grant the State's motion for summary

judgment on the issue of retaliation under the ADA.

---

[13]The record indicates that, because Flax could not drive for an extended length of time, he was unable to perform an essential function of his employment as a social worker. Contrary to Flax's position, the ADA does not require an employer to promote an employee as a means of a reasonable accommodation. The ADA was not designed to compensate individuals who hurt themselves at work but, rather, was enacted to vindicate the rights of individuals who are disabled but capable of performing their jobs. *See Hines v. Rimtec Corp.*, Civ. A. No. 07-966(NLH), 2008 WL 58877 (D.N.J. Jan. 2, 2008). Under the ADA, a "qualified individual" with a "disability" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The fact that when Flax left the employ of the State he was unable to work, has been found disabled by the Social Security Administration, and receives a State Employee Disability Pension establishes clearly that Flax does not have an ADA claim. Finally, it appears from the record that, rather than take an adverse action against Flax, the State assisted Flax by providing him with a short term assignment so that he could qualify for a disability pension with the State.

## V.   CONCLUSION

For the above stated reasons the court will grant the State's motion for summary

judgment.  An appropriate order will be issued.

CHIEF, UNITED STATES DISTRICT JUDGE

April 16, 2008

Wilmington, Delaware

FILED

APR 1 6 2008

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

-33-

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WILLIAM C. FLAX, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 03-922-GMS |
| | ) | |
| STATE OF DELAWARE Division of | ) | |
| Family Services, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

At Wilmington this 16 day of April, 2008, for the reasons set forth in the Memorandum

issued this date; the defendants' motion for summary judgment is **GRANTED.** (D.I. 198.) The

Clerk of the Court is directed to enter judgement in favor of the defendant and against the

plaintiff.

CHIEF, UNITED STATES DISTRICT JUDGE

FILED

APR 1 6 2008

U.S. DISTRICT COURT
DISTRICT OF DELAWARE